Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8377 | **DATE** | 11/7/2003 |
| **CASE TITLE** | Anna O. Ramos v. Schaumburg/Oakbrook Marriott Hotels, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons stated in the attached memorandum, Defendant's Motion for Summary Judgment [Doc # 15 ] is denied.

(11) [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 1 2 2003 date docketed | 30 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| acd/lc | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED
NOV 1 2 2003

| | |
|---|---|
| ANNA O. RAMOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 02 C 8377 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| SCHAUMBURG/OAKBROOK | ) |
| MARRIOTT HOTELS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Anna O. Ramos ("plaintiff" or "Ramos"), filed a complaint in this court alleging age discrimination by her former employer, Schaumburg Oakbrook Marriott ("defendant" or "Marriott"), under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Ramos' claim is premised upon Marriott's May 22, 2002 termination of her employment. Marriott's motion for summary judgment in its favor is before this court. For the reasons set forth below, summary judgment is denied.

### I. Summary Judgment Standard

At summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *See, e.g., Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). A

triable fact issue exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d 569, 573 (7th Cir. 2003) (quoting *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 923, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims," the non-movant must then present specific facts showing that there is an issue for trial. *Michael v. St. Joseph County, et al.*, 259 F.3d 842, 845 (7th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)). To successfully oppose the motion, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue. *Celotex*, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## II. Factual Background

### A. Ramos' employment at Marriott

Ramos worked at the Marriott Oakbrook Hotel ("the hotel") from May 1990 to May 22, 2002, the date of her termination. Marriott informed Ramos that she was being terminated for sleeping while on the clock. She was 59 years of age at the time of her termination.

Marriott hired plaintiff to work as a Server in the Banquet Department at the hotel. She subsequently became a Coffee Break Attendant in the Banquet Department (and continued in that

position until her termination). In that capacity, she was responsible for providing coffee services for meetings held in the hotel's conference rooms. As of May 2002, plaintiff's chain of command was as follows: Frank Truss, Lead Coffee Break Attendant (42 years of age);[1] John LaMonica, Banquet Attendant (48 years of age); Peter Pappas, Banquet Manager (45 years of age); and Sandra Gurgone, Director of Events Management (48 years of age).

Aside from Ramos and Truss, there were at least two other individuals working as Coffee Break Attendants on either a full-time or part-time basis at the time of plaintiff's termination: Margaret Espinosa (60 years of age), who was plaintiff's older sister; and Sandra Martinez (32 years of age), who worked as a fill-in Coffee Break Attendant on days for which relatively many coffee breaks were scheduled. Both Espinosa and Martinez, as well as Truss, remain employed by Marriott.

Plaintiff regularly worked on the 5:00 a.m. to 1:30 p.m. shift and took her lunch break from 10:30 a.m. to 11:00 a.m. She was required to punch out on the time clock for her lunch break.

### B. Marriott's disciplinary policies

Marriott maintains a progressive disciplinary policy and utilizes progressive discipline for certain disciplinary infractions. Marriott also maintains a list of offenses, deemed the "Deadly Sins," that are grounds for immediate termination. Ramos received a copy of the Deadly Sins and acknowledged the same in writing. The policy does not explicitly prohibit sleeping while on the clock. However, Number 15 of the Deadly Sins is "Serious Misconduct," and Marriott

---

[1] Defendant contends that LaMonica was plaintiff's immediate supervisor and that Pappas was her supervisor, and plaintiff contends that Truss was her immediate supervisor, but their dispute is not material to any issue presented by defendant's motion.

management testified that sleeping while on the clock constitutes "serious misconduct" and is grounds for immediate termination.

The hotel's General Manager, Ted Selogie (49 years of age), is the ultimate decision-maker with respect to every termination decision. He testified that in every case in which a supervisor or manager catches an employee sleeping on the job, the employee is terminated. He further testified that the prescribed discipline would not differ in the event the employee caught sleeping was "sick" at the time. Ramos acknowledged her belief that sleeping on the job is cause for immediate termination in a letter to Marriott in connection with the investigation preceding her termination.[2]

### C. The events of May 22, 2002

On May 22, 2002, plaintiff reported to work as scheduled at 5:00 a.m. She was not feeling well on that day and asked to take her lunch break early. She clocked out for lunch at exactly 9:31 a.m. She went to Pappas' office to make a phone call requesting a ride home.[3] She was told during the call that no one could pick her up until sometime after 11:30 a.m. After making the call, Ramos went into the ladies' restroom and rested on the couch inside the door. She clocked back in at exactly 10:00 a.m. The clock is located just outside the ladies' restroom.

Immediately after clocking back in, plaintiff returned to the restroom. She testified that

---

[2] Plaintiff's attempt to negate this admission by characterizing it as inadmissible hearsay is unavailing. She admitted to signing the letter and presenting it to Marriott management, and her acknowledgment that sleeping on the job is grounds for immediate termination constitutes a party admission.

[3] The parties dispute whether Pappas was present in his office while plaintiff placed the phone call (and, by extension, whether plaintiff then asked him to leave work early). Their dispute is immaterial -- first, because Pappas admits that he knew plaintiff was ill that day that day, and, in any event, because Selogie testified that an employee's being "sick" does not remove her from the force of Marriott's policy prohibiting sleeping while on the clock.

she did so because she had to throw up. Plaintiff admits that she was in the ladies' restroom while on the clock for about the next 30 minutes (from approximately 10:00 a.m. to 10:30 a.m.). She testified that she was ill during the time in question.

During that period of time, Gurgone went into the ladies' room twice, approximately ten to fifteen minutes apart. Gurgone testified that she saw Ramos sleeping on the sofa in the same position both times. After the first time Gurgone saw Ramos on the sofa, she departed the restroom and asked LaMonica whether Ramos was on her break. Because LaMonica did not know whether Ramos was on her break, he and Gurgone checked the punch clock to determine whether Ramos was punched in. Barbara Melville, Director of Human Resources (54 years of age), joined in their effort. They were unable to determine whether Ramos was punched in because they did not have Ramos' time card (which was with Ramos). Gurgone thereafter returned to the bathroom to check on Ramos. When she did so, she found her in the same position.

When Gurgone went into the bathroom and saw Ramos, she suspected that Ramos was sleeping because Melville had previously informed her that Ramos was seen sleeping in that area. (Ramos denies having done so.) When questioned at her deposition, Gurgone stated that she did not know whether Ramos was "unconscious," but that she was not "conscious being a state of being awake and looking around."

Ramos denies that she was sleeping and claims that she was sitting on the sofa with her hands covering her face such that Gurgone could not have seen her eyes. She testified that she was in that position for the entire time during which she was on the sofa -- approximately ten to fifteen minutes -- except for two times when she looked up after hearing someone enter and leave

5

the restroom. She was unable to identify who entered and left the restroom.[4]

Plaintiff left the restroom at approximately 10:30 a.m. At that time, she went to make a phone call for a ride to pick her up, went to wait for her ride to pick her up, and then went to the cafeteria for a free lunch that was being served as part of associate appreciation week. Gurgone and LaMonica both observed her in the cafeteria at that time. Plaintiff never punched out that day and was paid for a full eight-hour shift.

### D. Marriott's investigation and subsequent discharge of plaintiff

The next day, May 23, 2002, LaMonica printed out plaintiff's "punch report" from the previous day and provided it to Melville. The report showed that Ramos had punched back in from her break at 10:00 a.m. Accordingly, Melville told Pappas that she needed to meet with Ramos because it had been determined that she was sleeping in the restroom while on the clock.

Melville and Ramos met on the afternoon of May 23rd, and both Gurgone and Pappas attended the meeting, as well. Melville opened the meeting by informing Ramos that she had been observed sleeping in the ladies' restroom the day before. Ramos responded by stating "No" and by contending that she was on her break and that she had been sick.[5] Melville told Ramos that she was not on her break. Melville decided that Ramos should be suspended and informed Ramos that she was being suspended pending a review and possible termination. Melville was the sole decision-maker with respect to plaintiff's suspension.

---

[4] Marriott contended in its opening memorandum that plaintiff "admits" that her eyes were shut while she was on the sofa. That contention was not supported by any citation to the record, and after plaintiff brought the issue to the court's attention in her response brief, defendant backed away from the contention in its reply brief. This court does not look favorably upon casual treatment of the facts.

[5] The parties dispute the sequence of the conversation (*i.e.*, at what point during the conversation plaintiff raised the issue of her illness), as well as whether Pappas subsequently told Melville that plaintiff was sick on the day in question, but their dispute is immaterial.

Marriott gave Ramos a choice between presenting her case to a Peer Review Panel or to General Manager Selogie, and Ramos chose the latter. In connection with Selogie's review, Melville recommended to him that Ramos be terminated for sleeping on the job.

Selogie testified that in such situations, he tries to remain objective; he talks to the employee to get his or her side, and he conducts an investigation. On June 4, 2002, Ramos presented a letter to Selogie. On the same day, Ramos and Selogie had an in-person meeting. Ramos initially stated that she had not been sleeping in the restroom. Selogie testified that she later admitted that she was sleeping, but Ramos denies that she made such an admission. Selogie testified that Ramos' admission was one of the determining factors in his subsequent decision to terminate her.

Selogie testified at his deposition about what he did to investigate following his meeting with Ramos. The testimony of other witnesses, including Marriott management employees, substantially contradicted Selogie's testimony in this regard. First, Selogie testified that he spoke to Gurgone and that she explained why she felt that plaintiff was sleeping. However, Gurgone testified that she was not involved in conducting Marriott's investigation.[6] Selogie also testified that he spoke to two employees -- Marie Wattenberg and Joan Rogers -- whom plaintiff claimed had knowledge of her being ill in the bathroom. He testified that both employees told him that they had not seen Ramos getting sick. However, at their depositions, Wattenberg and Rogers denied having any discussion with Selogie. Finally, Selogie testified that he spoke to Pappas during his investigation. Conversely, Pappas testified that he had no such conversation with Selogie.

---

[6] The parties failed to include a copy of the relevant deposition transcript page in their appendices, but defendant nonetheless admitted this "fact."

7

Selogie, as the individual ultimately responsible for termination decisions, decided that plaintiff should be terminated and notified her of the same via telephone. It is undisputed that Selogie and Melville were the sole "decision-makers" with respect to Ramos' termination.

### E. Subsequent hiring of coffee break attendants

Marriott contends that it did not hire anyone to replace Ramos and that employees who already worked as Coffee Break Attendants, on either a full-time or part-time basis, absorbed some of Ramos' hours. Martinez, who worked part-time as a Coffee Break Attendant, testified that she filled in for Ramos for a couple of weeks, a few hours a day. She stopped working as a Coffee Break Attendant in December 2002. Approximately ten months after plaintiff's termination, Marriott hired Raquel Torres, who was under 40 years of age, as a Housekeeping Associate and Coffee Break Attendant. She assumed Martinez's position in that she subsequently filled in occasionally to assist with coffee breaks. Marriott also contends that many of Ramos' hours disappeared due to decreasing demand for meeting rooms and, thus, coffee breaks.

Ramos claims that she was replaced, citing only her sister's bare, general testimony that Marriott hired Torres to work the hours formerly worked by Ramos and that Martinez and other unidentified employees under the age of 40 worked the hours formerly worked by Ramos.

### F. Marriott's treatment of other employees caught sleeping while on the clock

The record indicates that Marriott has terminated at least three other hotel employees for sleeping while on the clock *since* the time of plaintiff's termination, and all three were under the age of 40. They were Victor Tetter (37 years of age), a Banquet Department employee; Edward Salas (33 years of age), a Lounge Department employee; and Ping Kee (William) Ma, (31 years of age), a Banquet Department employee. It is undisputed that Salas and Ma were both

8

terminated following the first occasion on which they were caught sleeping while on the clock.[7]

However, the record contains conflicting evidence regarding whether Tetter was caught sleeping, but not terminated, on one or more occasions *prior* to the time at which he was terminated for sleeping while on the clock. Tetter testified in an affidavit that he was caught sleeping while on the clock on two occasions -- once by Pappas and once by LaMonica -- and that he received only a verbal warning each time.

Tetter submitted an affidavit stating that Pappas caught him sleeping while on the clock. At his deposition, Tetter testified that, in Spring 2001, he was sleeping in a banquet room while on the clock. He claimed that he looked up as Pappas opened the door, and that Pappas subsequently said something to the effect of, "Hey Victor, I don't want you sleeping in here." Tetter then denied being asleep. Pappas instructed him that if he caught him sleeping, he could be fired. These facts are undisputed, but Pappas, Tetter's supervisor, denied catching Tetter sleeping while on the clock.

Tetter also testified in his affidavit that LaMonica caught him sleeping. At his deposition, Tetter testified that, sometime in 2002, he was sleeping on the stairs in a hallway near a banquet room, and LaMonica encountered him and called his name. He responded by looking up and saying "Yes." He testified that LaMonica asked him, "[W]hat are you doing over here sleeping?"

---

[7] Ma's termination paperwork suggests that he was being terminated pursuant to the progressive discipline policy (*i.e.*, because he had incurred three written warnings in the prior nine months). However, Melville testified that he was immediately terminated because he was sleeping on the job. This supposed inconsistency is insufficient to show that Ma was treated more favorably than plaintiff, as there is no evidence that he was previously caught sleeping on the job but not terminated. Similarly, a draft version of Salas' disciplinary paperwork indicated that he was receiving discipline short of termination for sleeping on the job. However, Melville testified that the very next day, she prepared a corrected version of his paperwork pursuant to which he was terminated. This supposed inconsistency is likewise insufficient to show that Salas was treated more favorably than plaintiff, as Marriott terminated him upon the first and only occurrence of his sleeping on the job.

Tetter told LaMonica, "I sit down for a minute and dozed out." Tetter testified that he was sleeping for "probably about ten minutes," while conceding that he did not know for how long he slept. LaMonica told Tetter that he could be fired if he was sleeping on the job and told him to get up. Tetter returned to work. Tetter did not receive a written warning and was not terminated for that incident. These facts are, likewise, undisputed, but La Monica testified that he was not aware of any employee who was caught sleeping while on the clock who was not fired.

There is no evidence in the record that Pappas and/or Tetter reported the above incidents to anyone else or that Melville or Selogie was aware of either incident.

## III. Analysis

The ADEA prohibits employers from "discharging any individual. . .because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an ADEA claim, a plaintiff must prove that her age "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000) (internal quotations and citation omitted). A plaintiff may establish an ADEA claim through either direct evidence of her employer's discriminatory motive or the familiar indirect, burden-shifting approach. *See Schuster*, 327 F.3d at 573-74.

Having presented no direct evidence of discrimination, plaintiff seeks to prove her claim through the indirect approach. This approach entails a three-step inquiry. First, a plaintiff must establish a *prima facie* case of discrimination by establishing that: (1) she is over 40; (2) she was meeting her employer's legitimate expectations at the time of the complained of adverse employment action; (3) she was subjected to an adverse employment action; and (4) similarly-situated substantially younger employees received more favorable treatment. *Krchnavy*, 294 F.3d

at 875; *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Once the plaintiff has met this initial burden, the employer must produce a legitimate, non-discriminatory explanation for the adverse employment action. *Krchnavy*, 294 F.3d at 876; *Peele*, 288 F.3d at 326. If the employer offers a legitimate, non-discriminatory reason, the plaintiff must present evidence sufficient to prove that the proffered explanation is pretextual. *Krchnavy*, 294 F.3d at 876; *Peele*, 288 F.3d at 326. As the Seventh Circuit has recently made clear, "[a] plaintiff does not reach the pretext stage, however, unless she first establishes a *prima facie* case of discrimination." *Peele*, 288 F.3d at 326.

### A. *Prima Facie* Case of Discrimination

Only plaintiff's ability to meet the second and fourth prongs of her *prima facie* case is in dispute. First, defendant contends that plaintiff cannot demonstrate that she was meeting its legitimate expectations because, shortly before her termination, she was caught sleeping in the restroom while on the clock. Plaintiff admits that she was in the restroom for approximately 30 minutes while on the clock and that she was ill and was sitting on the couch therein for approximately ten to fifteen minutes, but she denies that she was sleeping during that time. She instead contends that she was sitting with her head in her hands (because she was ill). Plaintiff claims that, consequently, Gurgone could not have seen whether her eyes were closed (*i.e.*, because they were covered by her hands). Based on the foregoing, whether plaintiff was sleeping while on the clock is a disputed question of fact.[8]

---

[8] The conduct admitted by plaintiff might well not meet the legitimate expectations of many employers. However, defendant has not so argued and has not presented sufficient evidence to establish that such conduct (as opposed to sleeping while on the clock) did not meet its legitimate expectations. Relatedly, defendant has maintained that it terminated plaintiff's employment because it believed she was *sleeping* while on the clock and for no other reason.

11

Defendant next contends that plaintiff cannot prove that similarly-situated younger employees were treated more favorably. Plaintiff seeks to make the requisite showing in two alternative ways: (1) by proving that she was replaced by younger individuals; and (2) by proving that younger individuals whom management believed were sleeping on the job were not subjected to immediate termination upon their first such offense. Although plaintiff has not articulated her argument precisely in this manner, she essentially seeks to prove that even if she was not meeting Marriott's legitimate expectations, she can prove a *prima facie* case because she can show that Marriott applied its expectations in a discriminatory manner. *See, e.g., Peele*, 288 F.3d at 329-330. On this point, by citing the disparate treatment of similarly-situated employee Victor Tetter (who was substantially younger than plaintiff), plaintiff has presented sufficient evidence to create an issue for trial. It is, therefore, unnecessary for this court to address whether plaintiff has created a triable issue concerning her replacement and/or the absorption of her duties by substantially younger employees.

The formulation for determining whether two employees are "similarly situated" depends upon the context of the case. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "[I]n disciplinary cases -- in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason -- a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18 (citations omitted).

Marriott contends that Tetter is not a proper comparable because LaMonica was not a

12

decision-maker in plaintiff's case and because there was no evidence that Pappas or LaMonica observed Tetter "sleeping for an extended period of time, as was the case with Ramos." Marriott also contends that Tetter was not treated more favorably, pointing to his subsequent (February 9, 2003) termination for sleeping while on the job. Marriott's arguments are unavailing.

First, although Pappas and LaMonica were not "decision-makers" in plaintiff's case, it is undisputed that they had supervisory responsibility over plaintiff -- indeed, defendant contends that LaMonica was plaintiff's immediate supervisor and that Pappas was her supervisor. In any event, both were managers in the Banquet Department, where both plaintiff and Tetter worked. Moreover, it is undisputed that both Pappas and LaMonica were involved in the investigation that preceded plaintiff's termination. Thus, plaintiff and Tetter "dealt with the same supervisor" for purposes of this inquiry. Further, as hotel employees, both Ramos and Tetter were subject to the same standards -- including the hotel's stated policy of immediate termination for sleeping while on the clock. Finally, Marriott essentially contends that Tetter is not a proper comparable because neither Pappas nor LaMonica caught him while he was actually sleeping and because of various other circumstances attendant to the two respective incidents. Its arguments in that vein are unavailing.

With respect to the incident observed by LaMonica, it is undisputed that Tetter admitted to LaMonica that he had "dozed out" -- *i.e.*, that he was sleeping. Thus, whether LaMonica saw Tetter sleeping is irrelevant. Further, contrary to Marriott's argument, the fact that Tetter may have slept for a shorter period of time than plaintiff on the days in question is irrelevant and does not render Tetter an improper comparable -- foremost, because there is no evidence that Marriott's stated policy calls for different discipline as between employees caught sleeping for different periods of time. In any event, there is no evidence that LaMonica knew for how long

13

Tetter had been sleeping.

With respect to the incident observed by Pappas, Marriott contends that because Tetter denied to Pappas that he was sleeping, plaintiff may not rely upon the corresponding incident as evidence that similarly-situated employees were treated more favorably. However, plaintiff has also denied that she was sleeping at the time in question, although unlike Tetter, she was not questioned at the time of the incident. Although this incident presents a closer question than does the incident observed by LaMonica, the conduct in which plaintiff and Tetter were suspected of engaging and the surrounding circumstances were sufficiently similar to permit their comparison.[9]

From the above undisputed facts, a reasonable fact-finder could conclude that Marriott subjected Ramos to its stated policy of immediate termination for sleeping while on the clock, but did not subject Tetter to the same policy when he was caught sleeping and, instead, gave him at least one "get out of jail free" card, if not two. As such, plaintiff has satisfied her burden with respect to the fourth prong of the *prima facie* test.[10]

### B.     Legitimate, Non-Discriminatory Explanation for Termination

Marriott contends that it terminated Ramos because she was sleeping while on the clock. Marriott has thus satisfied its burden of producing a legitimate, non-discriminatory explanation

---

[9] The court's conclusion that plaintiff has established a *prima facie* case is in no way dependent upon this incident, as the incident observed by LaMonica is, alone, sufficient to meet the fourth prong.

[10] Contrary to Marriott's argument -- and mischaracterization of the holding in *Kuhn v. Ball State Univ.*, 78 F.3d 330 (7th Cir. 1996) -- plaintiff can meet the fourth prong by showing that even one single comparable was treated more favorably (*i.e.*, where they were arguably caught engaging in the same misconduct). *Kuhn* addressed not the sufficiency of a proffered comparison in a disparate discipline case, but rather "the sufficiency of a database to create a statistical inference." *Coyne v. Siemens Info. and Commun. Networks, Inc.*, No. 02 C 1472, 2003 U.S. Dist. LEXIS 4783, at *15 (N.D. Ill. Mar. 27, 2003) (rejecting employer's argument at summary judgment that single comparison was insufficient to establish fourth prong of *prima facie* test).

14

for her termination. *See, e.g., Reed v. Amax Coal Co.*, 971 F.2d 1295 (7th Cir. 1992) (upholding discharge of Title VII plaintiff for sleeping on the job); *Jones v. Provena St. Joseph Med. Ctr.*, No. 00-1286, 2000 U.S. App. LEXIS 25472 (7th Cir. Sept. 26, 2000) (same); *see also Perry v. Pierce Chem. Co.*, No. 00 C 50186, 2002 U.S. Dist. LEXIS 8716 (N.D. Ill. May 14, 2002) (sleeping on the job does not meet an employer's legitimate expectations); *Paulos-Johnson v. Advocate Trinity Hosp.*, No. 01 C 3639, 2002 U.S. Dist. LEXIS 2397 (N.D. Ill. Feb. 15, 2002) (same); *Pollard v. Azcon Corp.*, 904 F.Supp. 762 (N.D. Ill. 1995) (same).

### C.     Pretext

A plaintiff may prove pretext directly -- through evidence that an employer was motivated by discriminatory animus -- or indirectly -- through evidence that the proffered reason is unworthy of credence. *Schuster*, 327 F.3d at 574. To show that a proffered reason is unworthy of credence, a plaintiff must "prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." *Id.* (internal quotations and citation omitted). "[I]f the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn." *Id.*, at 575 (internal quotations and citation omitted). *See also Reeves*, 530 U.S. at 148. However, to establish that a reason is unworthy of credence, "it is insufficient for the employee to show that the employer acted incorrectly or undesirably by firing [her]; instead, the employee must show that the employer did not honestly believe in the reasons it gave for firing [her]." *Krchnavy*, 294 F.3d at 876 (internal quotations and citation omitted). *See also Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (plaintiff must show that reason given was a "lie" or a "phony reason").

Plaintiff advances a handful of arguments in an effort to show that Marriott's reason for

terminating her employment is unworthy of credence: (1) plaintiff was not actually sleeping; (2) plaintiff was sick at the time during which she is accused of sleeping while on the clock; (3) defendant's investigation was not as thorough as it should have been; and (4) Selogie, one of two decision-makers and the ultimate decision-maker, lied about the investigation preceding and forming the basis for his decision to terminate her employment.

The first three arguments fail because the issue at the pretext stage is not whether the underlying conduct for which plaintiff was terminated actually occurred, but whether defendant reasonably believed it did. *See Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997) ("when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination"); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) ("[a]ny pretext determination is concerned with whether the employer honestly believes in the reasons it offers, not whether it made a bad decision") (internal quotations and citation omitted); *Gustovich v. AT&T Commun., Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reasons is honest); *see also Pollard*, 904 F.Supp. at 770-71 (plaintiff's "self-serving denial that he slept on the job is not enough to defeat a summary judgment motion"; "whether a reasonable jury would find that [the plaintiff] was not sleeping...is irrelevant"; "the issue is whether [the employer's] reason for firing [plaintiff] was 'phony'").

Thus, plaintiff's contention that she was not actually sleeping while on the clock is insufficient to create a triable fact issue as to whether Marriott *honestly believed* that she was sleeping on the sofa in the restroom. Likewise, whether plaintiff was "sick" on the day in

16

question and the extent to which Marriott was aware of her sickness is simply not relevant to whether Marriott *honestly believed* that she was sleeping while on the job and terminated her as a result.[11] Plaintiff's argument that the investigation was not as thorough as she believes it should have been fails for essentially the same reason. Even where an "investigation was the reason given for the discharge, [] a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677-79 (7th Cir. 1997) (internal quotations and citation omitted) (rejecting "theory that the company's investigation was so impulsive and shoddy that it reeks of discriminatory intent"; "whatever curious process a company employs to reach its decisions is irrelevant so long as nothing in the record suggests that the process is discriminatory"); *Rand*, 42 F.3d at 1145 (finding that plaintiff's allegation that decision-making process was a "sham" because certain key individuals were not interviewed did not aid plaintiff in showing pretext); *see also Ghosh v. Indiana Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir. 1999) (court does not sit as a super-personnel department to second-guess the investigative process).

However, plaintiff's argument concerning whether Selogie testified truthfully about his pre-termination investigation is compelling. "Because a fact-finder may infer discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *Zaccagnini*, 338 F.3d at 676 (internal quotations and citation omitted). The record contains conflicting evidence concerning the form and substance of Selogie's pre-termination investigation of plaintiff. First, Selogie testified that plaintiff admitted during their

---

[11] Plaintiff has not presented any evidence to show that Marriott had a policy or practice of treating "sick" employees caught sleeping on the job any differently from other employees caught sleeping on the job, and the only record evidence on the point establishes otherwise.

meeting that she was sleeping while on the clock and that her admission contributed to his decision that she should be terminated. Plaintiff testified that she did not make such an admission. Moreover, Selogie testified that he interviewed or consulted Gurgone, Pappas, Wattenberg, and Rogers in connection with his investigation, but *all four employees* -- two of whom are Marriott management employees -- testified to the contrary. Plaintiff has, thus, pointed to specific facts in the record that call into question Selogie's credibility, which is sufficient to warrant denial of Marriott's motion. *See Schuster*, 327 F.3d at 578; *Rand*, 42 F.3d at 1146. From the record evidence, a reasonable fact-finder could conclude that Selogie lied about his investigation. The investigation, if not the "reason" for plaintiff's termination, is sufficiently tied to the reason to permit a finding of pretext in the event the fact-finder concludes that Selogie lied about it. A reasonable fact-finder could infer from Selogie's lying about the investigation that the real reason for her termination was discrimination.[12]

In sum, this evidence, in combination with evidence of Marriott's comparative treatment of plaintiff and Tetter, could permit a trier of fact to find pretext. *See Reeves*, 530 U.S. at 143, 149; *see also Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 580-81 (7th Cir. 2003) (affirming jury finding in favor of ADEA plaintiff and concluding that jury could have inferred pretext from disparate discipline of plaintiff and another employee).

---

[12] Of course, under the indirect method of proof, a plaintiff is not required to produce evidence of discrimination to survive summary judgment. *See Zaccagnini*, 338 F.3d at 680; *see also Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) (plaintiff need not prove that the real reason is discrimination to survive summary judgment; "[b]ecause a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment") (citation omitted).

18

## IV. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is denied.

Enter:

_____
David H. Coar
**United States District Judge**

**Dated: November 7, 2003**